UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONTEST PROMOTIONS, LLC,<br><br>   Plaintiff,<br><br>   v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>   Defendant. | Case No. 16-cv-06539-SI<br><br>**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 8 |

This Court has presided over several disputes between plaintiff Contest Promotions LLC ("Contest Promotions") and defendant City and County of San Francisco ("San Francisco" or "the City") related to San Francisco's sign regulations.[1] Before the Court is plaintiff's motion for a preliminary injunction.[2] Plaintiff seeks an injunction to prevent the City from enforcing provisions of the San Francisco City Planning Code ("Planning Code") and from levying associated fines.

On December 21, 2016, the Court held a hearing on plaintiff's motion. After careful consideration of papers submitted, the Court hereby DENIES plaintiff's motion.

**BACKGROUND**

Contest Promotions organizes and operates contests and raffles whereby individuals are invited to enter stores for the purpose of filling out applications and winning prizes. Decl. Shafner

---

[1] Case Nos. 09-cv-04434 (closed Feb. 4, 2013), 15-cv-04365 (closed Mar. 17, 2016), 15-cv-00093 (closed July 28, 2015), *appeal docketed*, No. 15-16682 (9th Cir. Aug. 25, 2015), and 16-cv-06539 (filed Nov. 10, 2016).

[2] Plaintiff has also filed a motion for an injunction pending its appeal in Case No. 15-cv-00093. This order does not address that motion.

(Dkt. No. 11) ¶ 2.[3] Contest Promotions advertises these contests and the products they promote by posting signs on or adjacent to small businesses, directing customers to apply inside. *See id.* For example, Contest Promotions may advertise a film or videogame on its sign, inviting entrants to apply inside the store for a chance at free tickets to the film or a free copy of the game. *See id.* ¶¶ 3-4. Contest Promotions operates by leasing a portion of a business's permissible on-site signage space and some interior space to set up materials related to the contest, describing its lease payments to store owners as "typically small," because "[t]he real benefit to [store owners] is the increased in-store traffic driven by the . . . contest[.]" *Id.* ¶¶ 3, 6.

Article 6 of the Planning Code regulates signs within San Francisco. Article 6 prohibits the placement of new "General Advertising Signs," off-site advertisements such as billboards, after March 5, 2002. *See* Plaintiff's RJN (Dkt. No. 9) at 341, Ex. II § 611.[4] Despite the prohibition on new General Advertising Signs, the Planning Code allows "Business Signs" (and others) that meet various size, location, permitting, and other requirements set forth in Article 6.[5]

Contest Promotions began conducting business in San Francisco in 2004. Decl. Shafner (Dkt. No. 11) ¶ 7. In early 2007, San Francisco sought to enforce its ban on General Advertising Signs against Contest Promotions. *Id.* ¶ 8. Contest Promotions resisted; the company had developed its model in San Francisco precisely to avoid having its signs categorized as prohibited

---

[3] Unless otherwise noted, ECF docket citations refer to Case No. 16-cv-06539. Pinpoint citations are to the page numbers generated by ECF.

[4] Plaintiff requests the Court take judicial notice of: San Francisco Planning Department Notices of Enforcement and Notices of Planning Department Requirements; state and federal court dockets and filings; San Francisco city ordinances and resolutions; and Article 6 of the Planning Code. *See* Dkt. No. 9. Federal Rule of Evidence 201 permits a court to take judicial notice of facts "not subject to reasonable dispute." Fed. R. Evid. 201. Further, a court can "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Ranchiera Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (internal citations omitted). The Court finds these items appropriate for judicial notice, and, in the absence of any opposition, GRANTS plaintiff's request.

[5] The Planning Code defines a "Business Sign" as "[a] sign which directs attention to the primary business, commodity, service, industry or other activity which is sold, offered, or conducted on the pemises upon which such sign is located, or to which it is affixed. . . . The primary business, commodity, service, industry, or other activity on the premises shall mean the use which occupies the greatest area on the premises upon which the business sign is located, or to which it is affixed." Plaintiff's RJN (Dkt. No. 9) at 298, Ex. II § 602.3.

2

1  General Advertising Signs under the Planning Code. *See id.* After unsuccessful negotiations between Contest Promotions and the City Planning Department, the City served Contest Promotions with a number of violation notices. *Id.* ¶¶ 9-10. In response, Contest Promotions removed or modified some of its signs, and commenced its first lawsuit in this Court (the "2009 Action"), challenging the constitutionality of the S.F. Planning Code's definitions of "Business Signs" and "General Advertising Signs" as impermissibly vague.[6] *Id.* ¶ 12.

The parties eventually settled their dispute in early 2013 and entered into a settlement agreement. *Id.* ¶ 12 & Ex. B. The settlement agreement provided that Contest Promotions' signs would "be deemed Business Signs for all purposes of the Planning Code, including but not limited to the filing, processing and approval of permits . . . so long as [the signs] are consistent with the dimensional, locational, and other requirements applicable to Business Signs . . . ." Decl. Shafner, Ex. B (Dkt. No. 11) at 14. The settlement agreement further provided, in short, that Contest Promotions would seek new permits from the City for its existing sign inventory and would pay the City $375,000. *Id.* at 14, 17-18.

In July 2014, soon after the parties settled the 2009 Action, the City amended the definition of "Business Sign" in the Planning Code to what is essentially today's definition. *See* Plaintiff's RJN, Ex. X (Dkt. No. 9) at 120-21. After the City denied permit applications for some of its signs, Contest Promotions commenced Case No. 15-cv-00093 (the "January 2015 Action") in this Court, challenging the constitutionality of the City's new "Business Sign" definition. The Court dismissed the case, finding that the planning code definition was a content-neutral regulation of commercial speech that withstood intermediate judicial scrutiny. After the Court's final dismissal order in July 2015, Contest Promotions appealed to the Ninth Circuit. The appeal is fully briefed and awaiting oral argument. The parties have continued to litigate other claims in state court.

In September and October 2016, the City served plaintiff with 20 Notices of Enforcement ("NOEs") alleging that certain of plaintiff's signs violated provisions of Planning Code Article 6.[7]

---

[6] The 2009 Action concerned an older version of the S.F. Planning Code, which included definitions for Business Signs and General Advertising Signs different from those found today.

[7] The NOEs allege a variety of violations at different properties. *See* Plaintiff's RJN (Dkt.

3

*See* Plaintiff's RJN (Dkt. No. 9), Exs. A-T. In response to the City's NOEs, plaintiff modified eleven of its signs to avoid accruing penalties. *See* Decl. Anon (Dkt. No. 12). Plaintiff then filed this lawsuit challenging Article 6 of the Planning Code in its entirety on November 10, 2016 and filed a motion for preliminary injunction four days later. *See* Compl. (Dkt. No. 1); Mot. (Dkt. No. 8). Plaintiff has since changed at least four of its modified signs back to their original, promotional content. *See* Supp. Decl. Anon (Dkt. No. 23) ¶ 2.

On October 24, 2016, after serving plaintiff with the NOEs, the City passed Ordinance No. 218-16, amending the S.F. Planning Code to, among other things, clarify that Article 6 of the Code "shall [not] apply to . . . [n]oncommercial signs," and to create harsher penalties for repeat violators of Article 6. *See* Decl. Emery (Dkt. No. 21), Ex. D, at 21, 27, 29-31. The Mayor signed the ordinance on November 10, 2016, and it became effective on December 10, 2016. *Id.* at 31-33. The City maintains that its amendment exempting all noncommercial speech from the regulations in S.F. Planning Code Article 6 only formally codified the rule from *City and Cnty. of S.F. v. Eller Outdoor Aver.*, 192 Cal. App. 3d 643 (1st Dist. 1987). *See id.* at 664-65 (interpreting exceptions from Article 6 as "embrac[ing] *all* categories of noncommercial messages, thereby preserving the ordinance's neutrality[.]"); *see also Metro Fuel LLC v. City of S.F.*, No. 07-6067, 2011 WL 900318, at *11 (N.D. Cal. Mar. 15, 2011) (citing *Eller* in finding that "all non-commercial messages are still allowed throughout San Francisco.").

Plaintiff's motion in this case seeks to enjoin the City's assessment of penalties until the lawsuit is fully resolved. Because plaintiff has not demonstrated a likelihood of success on the merits, the Court DENIES plaintiff's motion for a preliminary injunction.

---

No. 9), Exs. A-T. The majority of the NOEs cite violations of district-specific size or location requirements. At least four NOEs state that plaintiff's signs are located on, or adjacent to, vacant businesses. Others cite violations of restrictions on signs in historic, conservation, or residential districts without proper approval. None of the NOEs state that plaintiff's signs do not fit the definition of onsite business signs, just that the signs are, *inter alia*, too large, located too far from the business, lack district-specific permits, or are affixed to vacant businesses. At the hearing on this matter, the City suggested that it carefully cited only those Contest Promotions signs violating provisions other than Planning Code section 602.3, in an effort to "clean up" some of Contest Promotions' inventory during the appeal of the January 2015 Action.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions. In order to obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008) (citations omitted). Courts have also applied an alternative "sliding scale" or "serious questions" test, requiring that the plaintiff raise "serious questions going to the merits" and show that "the balance of hardships tip[s] sharply in plaintiff's favor." *See Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011); *id.* at 1135 (stating plaintiff must also show a "likelihood of irreparable injury and that the injunction is in the public interest."). The sliding scale approach allows courts to balance the factors, offering flexibility where, for example, the plaintiff makes a weaker showing of likelihood of success, but a strong showing of irreparable harm. *Id.* at 1131. Regardless of the approach, a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22; *see also Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (plaintiffs "face a difficult task in proving that they are entitled to this 'extraordinary remedy[.]'").

**DISCUSSION**

**I.      Standing**

Contest Promotions brings this action challenging, facially and as-applied, the constitutionality of Article 6 of the Planning Code. *See* Mot. (Dkt. No. 8) at 12. The City argues that Contest Promotions lacks standing to challenge Article 6 in its entirety as Contest Promotions has only been cited for violations of a handful of provisions in Article 6. Opp'n (Dkt. No. 20) at 12-13. In its Reply, Contest Promotions concedes that a challenge to the entire Article 6 is inappropriate – Contest Promotions therefore narrows its challenge to focus on sections 602.3, 604(a), 604(i), 606, 607.1, 607.2, and 610 of the Planning Code. Reply (Dkt. No. 22) at 6.

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury

5

in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009). The Ninth Circuit has held that a sign company only has standing to challenge the provisions applied to it, and "cannot leverage its injuries under certain, specific provisions to state an injury under [a] sign ordinance generally." *Get Outdoors II, LLC v. City of San Diego, Cal.*, 506 F.3d 886, 892 (9th Cir. 2007) (citation omitted).

In addition to lost revenues from the signs it has changed, plaintiff faces daily fines from the City for each of its signs in violation of the code; the threat of accruing fines is actual and imminent, and redressable through a favorable judicial decision. Plaintiff has standing to challenge the provisions of the Planning Code cited in its Reply, as well as provisions directly impacting the interpretation or enforcement thereof.

Having resolved the threshold inquiry of standing, the Court turns to the parties' substantive arguments on plaintiff's motion for a preliminary injunction. Plaintiff asserts it is entitled to a preliminary injunction under both the standard and sliding scale approaches. Either approach involves an assessment of all four *Winter* factors, beginning with the plaintiff's likelihood of success on the merits.

## II.     Likelihood of Success

"The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citation omitted). Courts treat likelihood of success as a "threshold inquiry," disregarding the other factors when a plaintiff fails to show a likelihood of success on the merits. *See id.*

### A.     First Amendment

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. States and local governments are bound by this prohibition through the Fourteenth Amendment to the Constitution. *Reed v. Town of Gilbert,*

6

*Ariz.*, 135 S. Ct. 2218, 2226 (2015).  The First Amendment protects both commercial and noncommercial speech.  *See Bigelow v. Virginia*, 421 U.S. 809, 818 (1975). However, the "Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger v. Youngs Drugs Prods. Corp.*, 463 U.S. 60, 64 (1983) (citing *Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562-63 (1980)); *see also Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) ("[The Supreme Court] ha[s] always been careful to distinguish commercial speech from speech at the First Amendment's core.").

Courts typically evaluate regulations affecting commercial speech using a form of intermediate scrutiny established by the Supreme Court in *Central Hudson*, whereas content-based regulations of noncommercial, fully protected speech are presumptively unconstitutional and must withstand strict scrutiny. *Central Hudson*, 447 U.S. at 556. Contest Promotions argues that in light of recent Supreme Court and Ninth Circuit precedent, *Central Hudson* no longer applies to restrictions that distinguish between commercial and noncommercial speech, and the Court must instead apply either strict scrutiny or "heightened" scrutiny to the Planning Code.

### 1. Level of Scrutiny

First, the Court must determine which level of constitutional scrutiny applies to the challenged provisions of the Planning Code.  Contest Promotions asserts that the portions of Article 6 the City seeks to enforce against it are facially unconstitutional content-based restrictions on speech.  Contest Promotions argues that under *Reed*, regulations such as Article 6 that distinguish between commercial and noncommercial speech are "content-based" and subject to strict scrutiny.  Mot. (Dkt. No. 8) at 20-23, 25-26; Reply (Dkt. No. 22) at 6-9; *Reed*, 135 S. Ct. 2218.  Contest Promotions further argues that under *Sorrell v. IMS Health Inc.* and *City of Cincinnati v. Discovery Network, Inc.*, content-based restrictions on commercial speech are subject to at least "heightened" scrutiny.  Mot. (Dkt. No. 8) at 24-25; Reply (Dkt. No. 22) at 7-9; *Sorrell*, 564 U.S. 552 (2011); *Discovery Network*, 507 U.S. 410 (1993).  The City argues that none of the cases plaintiff cites to have changed the constitutional framework applicable to regulations

7

suppressing or burdening commercial speech, and that *Central Hudson* and *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), continue to govern the sign regulations at issue here. Opp'n (Dkt. No. 20) at 15-20. For the reasons set forth below, the Court agrees with the City.

The *Reed* Court addressed a restriction on noncommercial speech. *Reed* concerned a law banning outdoor signs without a permit, with some 23 exemptions for specific types of signage. 135 S. Ct. 2218 (2015). The exemptions placed varying restrictions on signage depending on which exemption a sign fell into. For example, the law exempted "ideological signs" or "political signs" from the outright ban. Plaintiffs, a local church, challenged the law after the Town of Gilbert repeatedly cited them for failure to comply with the requirements imposed by the "Temporal Directional Signs Relating to a Qualifying Event" exemption. The exemption encompassed signs directed at motorists or other passersby that advertised for events sponsored by a non-profit. *Id.* at 2225. The law imposed certain size, location, and duration restrictions on these types of signs that were more severe than the restrictions placed on ideological signs or political signs. *Id.*

Justice Thomas, joined by five other Justices, struck down the law, finding that the exemptions were content-based on their face, and could not withstand strict scrutiny. In arriving at this conclusion, the Court emphasized three guiding principles that compelled the result. First, a content-based restriction on speech is subject to strict scrutiny regardless of the government's motive; therefore "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* at 2222. Second, "'[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Id.* at 2230 (quoting *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 530, 537 (1980)). Therefore, the mere fact that a law is viewpoint neutral does not necessarily insulate it from strict scrutiny. Third, whether a law is speaker-based or event-based makes no difference for purposes of determining whether it is content-based. *Id.* at 2231 ("A regulation that targets a sign because it conveys an idea about a specific event is no less content based than a regulation that targets a sign because it conveys some other idea.").

Justice Alito, joined by Justices Sotomayor and Kennedy, took part in the majority opinion but wrote separately to "add a few words of further explanation." *Id.* at 2233 (Alito, J., concurring). Therein, Justice Alito noted that "the regulations at issue" were "replete with content-based distinctions, and as a result [had to] satisfy strict scrutiny." *Id.* Justice Alito stated that the decision "does not mean, however, that municipalities are powerless to enact and enforce reasonable sign regulations," and outlined a non-exhaustive list of signage regulations that would not trigger strict scrutiny. *Id.* These included, *inter alia*, "[r]ules distinguishing between on-premises and off-premises signs" and "[r]ules distinguishing between the placement of signs on commercial and residential property." *Id.* Justice Alito concluded by writing that "[p]roperly understood," the "decision will not prevent cities from regulating signs in a way that fully protects public safety and serves legitimate esthetic objectives." *Id.* at 2233-34. Justices Kagan, Ginsburg, and Breyer rejected the notion that a content-based regulation must necessarily trigger strict scrutiny, and concurred only in the judgment. *Id.* at 2234-39.

Four years before *Reed*, in *Sorrell v. IMS Health Inc.*, the Supreme Court held that content- or speaker-based restrictions on protected expression must undergo "heightened judicial scrutiny." 564 U.S. 552, 565-66 (2011). There, the Court invalidated a Vermont law restricting the sale, disclosure, and use of pharmacy records for marketing purposes. *Id.* at 557-58. On its face, the law was both content- and speaker-based. In fact, Vermont enacted the law with the avowed purpose of "diminish[ing] the effectiveness of marketing by manufacturers of brand-name drugs." *Id.* at 565. After determining that heightened judicial scrutiny of the law was likely required, the Court did not actually define or apply heightened scrutiny. *Id.* at 571. The Court concluded that it need not "determine whether all speech hampered by [the Vermont law]" was commercial, because "the outcome [would be] the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny [was] applied." *Id.* at 571. The Court applied intermediate *Central Hudson* scrutiny and struck down the Vermont statute. Nowhere in the opinion did the Court overrule *Central Hudson* or declare that intermediate scrutiny should no longer apply to restrictions burdening only commercial speech.

Additionally, in *Discovery Network*, the Court struck down a Cincinnati ordinance which

9

banned newsracks containing "commercial handbills," but not newsracks containing newspapers. The Court applied *Central Hudson* intermediate scrutiny. 507 U.S. 410 (1993). The Court found that the ordinance Cincinnati relied on for its ban was enacted at a time "long before any concern about newsracks[,]" and rather than regulate the "size, shape, appearance, or number" of racks, the city resorted to outright prohibition. *Id.* at 417. The Court also found an insufficient "fit" between the city's goals, safety and aesthetics, and its method of achieving those goals, an outright ban on commercial newsracks, because commercial newsracks comprised a very small percentage of the city's total newsracks. *Id.* Much of the Court's discussion centered on the city's inability to provide a basis for distinguishing between newspapers and commercial handbills in this manner. *Id.* at 424-28.

In brief, a regulation that suppresses or burdens noncommercial speech based on its content or the speaker must undergo strict scrutiny after *Reed*. Similarly, *Sorrell* dictates that a regulation that suppresses or burdens protected expression, based on the speaker or content thereof, must undergo "heightened" scrutiny. *See Sorrell*, 564 U.S. 552. *Discovery Network* demonstrates that intermediate scrutiny is a searching inquiry, and that courts should examine whether a regulation actually advances the government's interests. Plaintiff may be correct that, after *Reed*, a restriction merely distinguishing between speech based on whether it is "commercial" or "noncommercial" is "content-based," even if it does not target a particular topic or speaker. However, it is not clear that such a generalized restriction on commercial speech need withstand anything more than *Central Hudson*'s intermediate scrutiny. *See Lone Star Security & Video, Inc. v. City of L.A.*, 827 F.3d 1192, 1198 n.3 (9th Cir. 2016) (dictum) ("But, although laws that restrict only commercial speech are content based, *see Reed III*, 135 S. Ct. at 2232, such restrictions need only withstand intermediate scrutiny. *See Central Hudson* . . . ."). Plaintiff cites to no authority that a regulation burdening only commercial speech, without restricting a particular commercial speaker or subject, must undergo a higher level of scrutiny.

Subjecting content-based restrictions of noncommercial speech to strict scrutiny ensures that a particular speaker, viewpoint, or subject cannot be treated less favorably than other speakers, viewpoints, or subjects, except in the most extreme circumstances. Commercial speech,

10

however, has historically been afforded lesser First Amendment protection. *See Sorrell*, 564 U.S. at 582-83 (Breyer, J., dissenting) (citations and internal quotation marks omitted) ("[S]peech-related risks and offsetting justifications differ depending upon context," and "the First Amendment offers considerably less protection to the maintenance of a free marketplace for goods and services."); *Metromedia*, 453 U.S. at 505 (1981) (citing *Valentine v. Chrestensen*, 316 U.S. 52 (1942)) ("The extension of First Amendment protections to commercial speech is a relatively recent development in First Amendment jurisprudence. Prior to 1975, purely commercial advertisements of services or goods for sale were considered to be outside the protection of the First Amendment."). Since *Central Hudson*, regulations suppressing or burdening commercial speech must withstand intermediate judicial scrutiny. 447 U.S. at 566. This rule presently remains undisturbed.

Under *Central Hudson*, First Amendment protections apply to commercial speech only if the speech concerns a lawful activity and is not misleading. 447 U.S. at 563-66. Once it has been established that the speech is entitled to protection, any government restriction on that speech must satisfy a three-part test: (1) the restriction must seek to further a substantial government interest; (2) the restriction must directly advance the government's interest; and (3) the restriction must reach no further than necessary to accomplish the given objective. *Id.* Here, the City does not contend that plaintiff's signs are either unlawful or misleading. Accordingly, the Court will presume the commercial speech at issue is entitled to First Amendment protection and apply the *Central Hudson* framework.

### 2. Application of Scrutiny

Having determined that *Central Hudson*'s intermediate scrutiny applies to the Planning Code restrictions at issue here, the Court must now determine whether: (1) the restriction seeks to further a substantial government interest; (2) the restriction directly advances the government's interest; and (3) the restriction reaches no further than necessary to accomplish the objective. *Cent. Hudson*, 447 U.S. at 563-66.

First, the sign regulations at issue must seek to further a substantial government interest.

11

S.F. Planning Code section 601 lists the purposes of Article 6 in regulating signs. *See* Plaintiff's RJN (Dkt. No. 9) at 297, Ex. II § 601. Article 6 aims to, among others, "safeguard and enhance property values in residential, commercial, mixed use, and industrial areas"; "protect public investment in and the character and dignity of public buildings, open spaces and thoroughfares"; "protect the distinctive appearance of San Francisco . . ."; "encourage sound practices and lessen the objectionable effects of competition in respect to size and placement of signs"; "aid in the attraction of tourists and other visitors . . ."; and "reduce hazards to motorists and pedestrians traveling on the public way; and thereby to promote the public health, safety and welfare." *Id.* In essence, Article 6 seeks to promote safety and aesthetics. This Court has previously held that the City's interest in promoting traffic safety and aesthetics is a substantial governmental interest. *See Contest Promotions*, 100 F. Supp. 3d at 842 (citing *Metromedia*, 453 U.S. at 507-09). Moreover, as in the previous litigation, plaintiff appears to concede that regulation of safety and aesthetics are substantial governmental interests. *See, e.g.*, Compl. (Dkt. No. 1) ¶¶ 2, 48. The Court finds that the City has satisfied the first factor.

Second, the sign regulations must directly advance the government's substantial interests in safety and aesthetics. The Supreme Court has held that ordinances differentiating between on-site and off-site advertisements, as the San Francisco scheme does here, are directly related to the interests of safety and aesthetics.[8] *Metromedia*, 453 U.S. at 507-09; *see also Nat'l Adver. Co. v.*

---

[8] Plaintiff contends that *Metromedia* is not binding because the decision, which split 4-2-3, had no clear majority. However, Justice Stevens joined in much of the plurality's opinion, including those portions upholding distinctions between onsite and offsite commercial signs. *Metromedia*, 453 U.S. at 541 (Stevens, J., dissenting in part) ("I agree with the conclusion that the constitutionality of this prohibition is not undercut by the distinction San Diego has drawn between onsite and offsite commercial signs . . . and I therefore join Parts I through IV of [the plurality opinion.]"). Plaintiff argues that dissenting opinions "do not count" when applying the Supreme Court's guidance from *Marks v. United States*, 430 U.S. 188 (1977), to extract a majority view from fractured Supreme Court decisions.

The Court rejects plaintiff's contention that Justice Stevens's opinion cannot be used to demonstrate a majority as to those sections of *Metromedia* in which he joined. Whether courts may rely on a dissent to form a *Marks* majority is an open question in this Circuit. *See United States v. Davis*, 825 F.3d 1014, 1025 (9th Cir. 2016) (en banc) ("[W]e assume but do not decide that dissenting opinions may be considered in a *Marks* analysis."); see also *id.* at 1029 (Christen, J., concurring) ("[W]e leave unanswered whether our court will take into account dissenting opinions when applying *Marks*."). In this Court's view, because Justice Stevens expressly joined the plurality in *Metromedia* with respect to the first four sections, at least those four sections represent the opinion of a majority of the Court.

*City of Orange*, 861 F.2d 246, 248 (9th Cir. 1988) ("The City may prohibit billboards entirely in the interest of traffic safety and aesthetics, and may also prohibit them except where they relate to activity on the premises on which they are located."). Here, the City has created regulations that directly advance its interests in safety and aesthetics. The City's classification of business signs, with accompanying restrictions on size and location, undoubtedly reduce the overall number and square footage of signs in San Francisco, preventing additional distraction of motorists and pedestrians, and promoting aesthetics. The Court finds that the City has satisfied the second factor.

Finally, the restrictions must reach no further than necessary to accomplish the City's objectives. This element bears the most scrutiny. Here, the City "is not required to employ the least restrictive means conceivable, but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Greater New Orleans Broad. Ass'n, Inc. v. U.S.*, 527 U.S. 173, 188 (1999) (internal citation and quotation marks omitted). Contest Promotions argues that the contested provisions fail this prong because "[t]he City has exempted certain content and speakers, rather than regulating the 'size, shape and appearance' of signs." Mot. (Dkt. No. 8) at 31. The Court disagrees. The City exempts all noncommercial signs from the regulations in Article 6; Article 6 manages the size, shape, and appearance of Business Signs and other commercial signs. The City's restrictions on Business Signs appropriately balance the needs of business owners to identify their businesses and advertise certain products sold on-site with the City's interest in promoting aesthetics and safety by reducing the additional visual clutter and distractions associated with commercial signage and off-site advertising. *See Metromedia*, 453 U.S. at 512 (citations omitted) ("As we see it, the city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere."); *see also id.* at 501 ("Each method of communicating ideas is 'a law unto itself' and that law must

reflect the 'differing natures, values, abuses and dangers' of each method."). As such, "[t]he [C]ity has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite advertising and" noncommercial speech. *See Metromedia*, 453 U.S. at 508. The Court finds that the City has satisfied the third factor.

Plaintiff has failed to make a threshold showing of likelihood of success on the merits. Plaintiff's request for a preliminary injunction would ordinarily end here; however, plaintiff separately argues that it is entitled to an injunction under a line of cases beginning with *Ex Parte Young*, 209 U.S. 123 (1908).

### B.     Due Process / *Ex Parte Young*

Contest Promotions argues that it is forced to risk substantial daily penalties while litigating this action in violation of due process. Contest Promotions seeks an injunction under *Ex Parte Young* to prevent the imposition of penalties under the Planning Code while it obtains a determination as to the code's validity. The City argues that plaintiff is not entitled to *Ex Parte Young* relief because violation of the planning code is not the sole avenue of judicial review, the penalties are not severe enough to deter litigation, and determination of plaintiff's compliance does not require a complicated factual analysis.

A state cannot force a party to risk severe penalties to obtain a judicial determination if that determination involves a complicated or technical question of fact. *Ex Parte Young*, 209 U.S. at 145, 148. A statutory scheme that imposes penalties on those seeking judicial review is unconstitutional if "the penalties for disobedience are fines so enormous . . . as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation." *Id.* at 147. The right to judicial review "is merely nominal and illusory if the party to be affected can appeal to the courts only at the risk of having to pay penalties so great that it is better to yield to orders of uncertain legality rather than to ask for the protection of the law." *Wadley S. Ry. Co. v. Georgia*, 235 U.S. 651, 661 (1915).

The Court finds that the risks to plaintiff here are insufficient to justify relief under *Ex*

*Parte Young*. As the City points out, plaintiff can apply for a permit and contest the denial of that permit on the same grounds, without incurring daily penalties. Contest Promotions need not violate the Planning Code in order to challenge its constitutionality. Moreover, years of ongoing litigation between the parties also demonstrate that plaintiff has not been deterred by "prohibitive penalties." Accordingly, plaintiff's motion for preliminary injunction is DENIED.

## CONCLUSION

For the foregoing reasons, the Court hereby DENIES plaintiff's motion for a preliminary injunction.

This order resolves Dkt. No. 8.

**IT IS SO ORDERED**.

Dated: January 9, 2017

_____
SUSAN ILLSTON
United States District Judge